BRIDGES ASPHALT PAVING COMPANY *v.* NATIONAL PAVING COMPANY, INC.

4-3622

Opinion delivered December 10, 1934.

*House, Moses & Holmes,* for appellant.
*L. P. Biggs,* for appellee.

BAKER, J. Street Improvement District No. 518, of the city of Little Rock, organized for the purpose of paving a number of blocks on Louisiana Street, entered into a contract with the Emulsified Asphalt Distributors, Inc., hereinafter called the Emulsified, and the National Paving Company, hereinafter called the National, under which contract these two companies were to do the pav-

ing required. A. L. Busse was the president of the National Paving Company and the officer actively in charge of its business, and H. P. Harding was the president of the Emulsified Asphalt Distributors, Inc., and practically sole owner and actively in charge of its business. Bridges Asphalt Paving Company furnished the asphalt with which the paving was done, and its president was Edward Bridges. It may be said that the respective corporations were controlled, in all matters relating to the performance of the contract and matters out of which comes this litigation, by their respective presidents, and reference to any one of these officers in this proceeding will generally imply the company for which he was acting.

Bridges Company and Harding Company were in the same office at 844 Rush Street, Chicago, Illinois, and the secretary of each of these two corporations was Erwin Gaugh.

Bridges Asphalt Paving Company, the appellant here, was the producer of the product designated as the emulsified asphalt and had entered into a contract with Harding, whereby Harding became general sales agent for this product, having the exclusive right to handle it in several States, including Arkansas. The essential matters of the contract between the Bridges Company and Harding, prior to the time of the organization of the Emulsified Company, was to the effect that Harding was appointed the sales agent and distributor of the emulsified asphalt in the specified territory. Harding agreed that he would devote all of his time and energy exclusively to the promotion of sales and marketing of the products of the Bridges Company during the continuance of the agreement, or any renewal thereof, and he was not to engage, directly or indirectly, in any other business of any nature whatever, or be connected, or be affiliated with any person, firm, or corporation so engaged. It was also further agreed that Harding, or those associated with him, or any corporation he might organize to whom he might assign the contract, would have no power or authority to bind the Bridges Company by any contract, or to incur any duty or liability of any na-

ture whatsoever, including commissions, binding upon Bridges Company, and that the Bridges Company would not be bound by any warranty, statement or representation or agreement in connection with the sale of any products, unless the same be contained in a written contract for the sale of such products, and further that all sales made were to be billed and invoiced by Bridges Company directly to the purchaser, and Bridges Company alone should be entitled to collect all payments becoming due or payable upon such contracts or purchases.

After the execution of this contract and while it was still in force, Harding organized the Emulsified Company, in which he, at the time of the organization, took all the shares of the capital stock, except two, which were issued as qualifying shares and one of these was held by Edward Bridges.

Prior to the time of the letting of the contract by Improvement District No. 518, Harding knew of it, and, on account of the fact that he was unable to get local contractors to agree or deal with him, he approached Edward Bridges in an effort to have the Bridges Company do the paving work in order that he might procure the sale and use of Bridges emulsified products for this job. Bridges declined the proposition, and, upon Harding's insistence that he accept the proposition or lose the sale, Bridges advised him that he preferred to lose the sale rather than accept the contract to do the paving.

A little later Harding agreed with Busse for the National to take over the work. He advised Busse that there was a profit in the job of about $2,500. Harding and Busse, according to Busse's statement, denied however by Harding, entered into a contract by which their two companies, the National and the Emulsified, became partners and bid in and signed the contract to do the paving for District No. 518. The contract was signed by both corporations, the National by Busse, as president, and the Emulsified by Harding, as president. It has just been stated that Harding denied this secret partnership, but he also denied the execution of the contract, or that he had anything to do with it. His statements, however, are so inconsistent with other facts

established that no credence can be given to any testimony delivered by Harding.

Busse's statement is to the effect that the secret partnership agreement between him, representing his company, and Harding, representing his, was to the effect that Harding should furnish the emulsified asphalt to do the paving and that Busse should furnish the initial money or capital necessary to begin the work and carry on until pay days, met by the district, would take care of the obligations.

These agreements were, most probably, entered into before the paving contract was signed by the two corporations, as work was commenced upon the street the day of the execution of the contract with the improvement district. The engineer, employed by Harding, sent an order to the Bridges Company to forward a tank of emulsified asphalt with which to begin operations. Bridges, doubting the authority of the engineer, refused to do it, though the directions were to ship to the National Company, but, in order that the work might not be delayed, the Bridges Company shipped a tank of asphalt, billed to itself, with draft attached to a bill of lading, and notified the National Company. Busse, representing the National, refused to accept the shipment and complained to Harding about the fact that the draft had been drawn contrary to the agreement as made between him and Harding, whereby Harding was to furnish or supply the asphalt, and Harding promised to secure the release of the shipment at once. When Bridges learned that the shipment had not been received, he sent his son, Howard, to Little Rock to secure delivery of the asphalt, directing him to secure an order from the National Company for the delivery. After Howard Bridges arrived in Little Rock, he found that the National Company had entered into a bond with the U. S. F. & G. Company as its surety and arranged shortly thereafter for the delivery of the asphalt. He advised his father by long distance telephone what he had done. His father still insisted that he secure the order from the company. The order was given by the National Company but not to the Bridges Company, but to the Emulsified Distributors, Harding's com-

pany. After this had been done the engineer, in the absence of both Busse and Harding, showed to Howard Bridges the copy of the contract entered into by the two corporations with Improvement District No. 518. Howard Bridges returned to the Bridges Company's office, but did not immediately report to his father what he had discovered, but, of course, whatever information he had at that time must be deemed information within the knowledge of the Bridges Company. The Bridges Company continued to fill such orders as it received from time to time. The orders were given by the National Company to the Emulsified Distributors, and it sent bills or invoices for payment. This was done by Mr. Gaugh, the secretary of both the Bridges and Emulsified Companies.

On account of some conflicts in the testimony as abstracted, we have examined a part of the transcript. Bridges says that he wrote Busse a time or two for money on the contract, and in one or two letters he had from him, Busse was calling attention to the fact that the material was to be paid for on completion of the contract, but Bridges says he had agreed with Harding to give credit for thirty days. Bridges finally went to Little Rock to investigate. When he arrived he found rather a startling condition which he could not understand. Harding assured him he would get the money right away. At that time the contract had been practically completed. When Bridges talked with Busse, Busse told him that somebody had to help stand the loss, and said further: "You are the 'asphalt distributors' and we want you to put up."

Busse now insists, for his company, that the Bridges Company, as the manufacturer of the emulsified asphalt, must make good to him the loss incurred in the performance of the contract, which loss amounted to something more than $3,000, and this on a basis that Harding and the Emulsified Distributors, handling Bridges products, had bound the Bridges Company, as we assume, both by the contract and by the fact that all of the billings to Busse and the National were from the Emulsified and not from the Bridges Company, and insists that Bridges

and his company are estopped to assert their claim for the invoice price of the products bought.

There are several reasons why this attitude of Busse and his company is untenable. One of the reasons is that the National Company signed the contract to do the paving for the improvement district and that the Emulsified also signed that contract, by Harding, as its president, and Harding and Busse were working together for their respective corporations in the performance of the contract. For a greater part of the time, both were present while the work was going on, active in the performance thereof. Bridges and his company were in no sense a party to that agreement. All three of them, that is Busse, Harding and Bridges, were representing the three corporations as separate and distinct entities. All of them knew that the Bridges Company was manufacturing the emulsified asphalt, and that it was being shipped to the National Company for this job. They knew that Bridges was expecting payment because he had drawn a draft for the first shipment. Later payment was delayed by having Bridges wait until the completion of the job. Only Harding and Busse knew of the secret partnership agreement between them. The fact that Harding and Busse and their companies signed the paving contract gave no notice of their secret agreement or of the reason for delayed payments to Bridges, the effect of which conduct was to make Bridges contribute Harding's part of the capital used in the secret partnership agreement. Bridges wrote letters asking for payment, and yet he was not advised of these facts, nor did he learn anything about it until he was told by Busse that some one would have to help stand the loss of the moneys advanced by him.

The National, by Busse, its president, sent its telegram to the Bridges Company on October 6, when the contract was nearly completed, insisting that Bridges send a car at once with the emulsion in drums so that the highway department could take what he would not use, and he explained his telegram later by saying that he did not want to be charged with the amount the highway department got from his car. Busse knew when How-

ard Bridges came to Little Rock that the Bridges Company was furnishing this asphalt and not the Emulsified, but, according to this record, Bridges did not have knowledge of the secret partnership prior to the time he made his last shipment.

Without this information, he cannot be said to have approved, or ratified Harding's conduct in attempting to furnish Bridges' products for capital in his own enterprise. This was not within the apparent scope of his duties as a sales agent.

There is nothing in this statement, or in the more detailed statement, as shown by the record, to work an estoppel against the Bridges Company so as to prevent it from collecting the amount of money due it for the asphalt furnished.

We have already shown that the National Company was the purchaser of all of the asphalt ordered for the partnership. All of it was billed to the National Company and none of it to the partnership, but, according to Busse, it was intended for partnership use, and we see no reason why the partnership should not be made to pay for the products bought by it from Bridges, in performance of the partnership contract. Busse, representing the National, knew or should have known the limitations upon Harding's power to bind the Bridges Company. He was dealing with both as separate corporations. If inquiry of Harding had not disclosed the true situation, the facts could have been obtained from Bridges, and it was known, beyond question, that Harding's Company was distributing the products of the Bridges Company, and every inference that may be indulged is to the effect that Harding and Busse both were particularly careful in not disclosing any fact to Bridges that would lead him to an inquiry into their secret relations and agreements. They led him to believe that he would at least be paid when the contract was completed. Harding sent no orders for any shipments, gave no instructions in regard to them. He sent no letters or telegrams, so far as this record discloses, to Bridges, but these were sent by Busse and the National as being *bona fide* purchasers.

In the case of *Williams* v. *Carson*, 126 Ark. 618, 191 S. W. 401, this court held: "One dealing with this partnership would not have been bound by any private agreement of the partners unless he was aware of its existence, and was advised by the partner who claimed its protection that he would not be bound by the unauthorized acts of the partner."

Again in another case this court said: "In *Rector* v. *Robins* this court cited with approval *Meehan* v. *Valentine*, 145 U. S. 611, and this excerpt from that decision is applicable here: 'In the present state of the law upon this subject, it may perhaps be doubted whether any more precise general rule can be laid down than, as indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow, that the acts of one in conducting the partnership business are the acts of all; that each is agent for the firm and for the other partners; that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts; that all are liable as partners upon contract made by any of them with third persons within the scope of the partnership business; and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership.'" *Buford* v. *Lewis*, 87 Ark. 412, 112 S. W. 963.

The rule relating to the *National Company* as to its dealings with Harding and his company, as binding upon the Bridges Company, is set forth in the case of *International Harvester Co. of America* v. *McLaughlin*, 182 Ark. 1122, 34 S. W. (2d) 452, and the case of *J. T. Fargason Co.* v. *Dudley*, 173 Ark. 1148, 294 S. W. 6; *United States Bedding Co.* v. *Andre*, 105 Ark. 111, 150 S. W. 413.

The decree in this case must be reversed, and the cause is remanded, with directions to enter a decree for

the Bridges Company for the amount of the emulsified asphalt furnished by it and such other action as may be proper, not in conflict with this opinion.